**CASE NO. 23-1673**

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

BYRON MATTHEW JOHNSON,

*Plaintiff - Appellant,*

v.

ELDOR AUTOMOTIVE POWERTRAIN USA, LLC,

*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT ROANOKE

**OPENING BRIEF OF APPELLANT**

Thomas E. Strelka
STRELKA EMPLOYMENT LAW
4227 Colonial Avenue
Roanoke, VA 24018
540-283-0802
thomas@strelkalaw.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1673      Caption: Johnson v. Eldor Automotive Powertrain USA

Pursuant to FRAP 26.1 and Local Rule 26.1,

Byron Matthew Johnson
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?      ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?      ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thomas E. Strelka                    Date:    7/10/2023

Counsel for: Appellant, Byron Matthew Johnson

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................iii

I.    JURISDICTIONAL STATEMENT ......................................................1

II.   STATEMENT OF ISSUES ..................................................................1

III.  STATEMENT OF THE CASE .............................................................2

      A. Introduction ................................................................................ 2

      B. Johnson Raised FLSA Protected Complaints Immediately
         Prior to Termination....................................................................4

      C. A Retaliatory Performance Improvement Plan ...........................4

      D. Protected Activities Corroborated by Co-Worker.......................6

      E. Plaintiff's December 11, 2018 Email and "Overtime" .................7

      F. Mr. Johnson's Email - - A Protected Act - - Angers Mr.
         Piscone..........................................................................................9

IV.   SUMMARY OF ARGUMENT ...........................................................10

V.    STANDARD OF REVIEW..................................................................11

VI.   ARGUMENT ......................................................................................12

      A. FLSA Protects "Any Employee" – Including Mr. Johnson........13

      B. Mr. Johnson Made Written and Oral Complaints - - Oral
         Complaints Similarly Protected..................................................15

      C. One Month Prior and Two Days Prior: Quite the Temporal
         Proximity .....................................................................................17

i

D. *McKenzie v. Renberg* and the "Manager's Rule"...................... 18

VII.   CONCLUSION.....................................................................21

VIII.  REQUEST FOR ORAL ARGUMENT...................................................22

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................... 11

*Armstrong v. Index Journal Co.*,
647 F.2d 441 (4th Cir. 1981) ................................................. 20

*Ball v. Memphis Bar-B-Q Co.*,
228 F.3d 360 (4th Cir. 2000) ................................................ 13

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) ......................... 21

*Burlington N. & Santa Fe Ry. v. White*,
548 U.S. 53 (2006) .................................................................. 19

*Clark Cnty. School Dist. v. Breeden*,
532 U.S. 268 (2001) ............................................................... 17

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*,
555 U.S. 271 (2009) ........................................................... 19, 20

*Darveau v. Detecon, Inc.*,
515 F.3d 334 (4th Cir. 2008) ............................................. 12, 13

*DeMasters v. Carilion Clinic*,
796 F.3d 409 (4th Cir. 2015) .............................................. 19, 20

*Faragher v. City of Boca Raton*,
524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) ......................... 21

*Henson v. Liggett Group, Inc.*,
61 F.3d 270 (4th Cir. 1995) ..................................................... 11

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
563 U.S. 1, 131 S. Ct. 1325, 179 L. Ed. 2d 379 (2011) ............. 13-14, 15, 16

*King v. Rumsfeld*,
328 F.3d 145 (4th Cir. 2003) ................................................. 17

*Marlow v. Chesterfield Cnty. Sch. Bd.*,
749 F. Supp. 2d 417 (E.D. Va. 2010) ..................................... 12

*McKenzie v. Renberg's Inc.*,
94 F.3d 1478 (10th Cir. 1996) ............................................................. 3, 18

*Minor v. Bostwick Labs., Inc.*,
669 F.3d 428 (4th Cir. 2012) ................................................. 13, 15, 16, 18

*Mitchell v. Robert De Mario Jewelry, Inc.*,
361 U.S. 288, 80 S. Ct. 332, 4 L. Ed. 2d 323 (1960) ............................... 13

*Parkman v. Univ. of S.C.*,
44 F. App'x 606 (4th Cir. 2002) ............................................................ 11

*Penley v. McDowell Cnty. Bd. of Educ.*,
876 F.3d 646 (4th Cir. 2017) ................................................................ 17

*Price v. Thompson*,
380 F.3d 209 (4th Cir. 2004) ................................................................ 17

*Randolph v. ADT Sec. Servs., Inc.*,
701 F. Supp. 2d 740 (D. Md. 2010) .................................................. 14, 15

*Russell v. Microdyne Corp.*,
65 F.3d 1229 (4th Cir. 1995) ................................................................ 11

*Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123*,
321 U.S. 590, 64 S. Ct. 698, 88 L. Ed. 949 (1944) .................................. 13

*Williams v. Cerberonics, Inc.*,
871 F.2d 452 (4th Cir. 1989) ................................................................ 17

## Statutes and Rules

28 U.S.C. § 1291 ......................................................................................... 1

29 U.S.C. § 215 ................................................................. 1, 12, 13, 14, 18

Fed. R. Civ. P. 56 ...................................................................................... 11

## Other Authorities

Deborah L. Brake, *Retaliation in the EEO Office*,
50 Tulsa L. Rev. 1 (2014) .................................................................... 20

iv

## I.    JURISDICTIONAL STATEMENT

Appellant Byron Matthew Johnson filed suit in the United States District Court for the Western District of Virginia on November 2, 2020, for claims arising from his employment with Appellee Eldor Automotive Powertrain USA, LLC, ("Eldor").  (JA 8).  The single claim in this appeal is found in Count IV of Mr. Johnson's filed complaint: retaliation pursuant to the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3).

Eldor filed a motion for summary judgment on November 4, 2021. (JA 39). After hearing oral argument on December 15, 2021, the trial court granted Eldor's motion for summary judgment and dismissed Mr. Johnson's claim.  Appellant timely noted his appeal. (JA 1129).

This Court's jurisdiction rests on 28 U.S.C. § 1291, as the District Court entered a final order dispensing with all the pending claims before it. Mr. Johnson now brings this appeal to the District Court's Order of January 10, 2010, dismissing Count IV of his complaint: retaliation in violation of the FLSA.

## II.    STATEMENT OF ISSUES

1. The District Court erred in failing to consider Mr. Johnson's communications regarding overtime as protected activities under the FLSA.

2. The District Court erred in its application of the "manager's rule" to Mr. Johnson's matter.

1

3. The District Court erred in concluding that Mr. Johnson did not engage in protected activities pursuant to the FLSA.

4. The District Court erred in granting Eldor's motion for summary judgment as the light most favorable to Mr. Johnson supported the denial of Eldor's motion.

## III.  STATEMENT OF THE CASE

### A. Introduction

Eldor, an Italian company, owns and operates a manufacturing facility in Botetourt County, Virginia.  This facility manufactures precision parts for automotive applications.  Eldor hired Mr. Johnson on or about June 21, 2017, as an Engineering and Maintenance Manager, a supervisory position that he held until his termination from employment on or around December 13, 2018.  This position was considered "exempt" as per the FLSA overtime requirements. Throughout his employment, Mr. Johnson expressed concern that those working beneath him were not being compensated overtime compensation for hours worked in excess of forty hours per week.

Mr. Johnson consistently reported to those in the chain of command above him regarding his concerns for the "legality" of "not paying" non-exempt workers for work "over forty hours without some kind of compensation." Mr. Johnson never used the acronym "FLSA" in his complaints, but he did not need to do so.  Rather, he highlighted "Virginia

2

law" (which references the FLSA) and the need to pay workers for work "over forty hours." Indeed, his complaints ultimately led to an FLSA collective action against Eldor.

Eldor terminated Mr. Johnson on December 13, 2018. (JA 70). Prior to his termination, Mr. Johnson had never received a negative work performance evaluation or any workplace discipline. The only reason for his termination cited by Eldor, regarded Mr. Johnson's advocacy for non-exempt employees.

The trial court opined, "Johnson informed Eldor that it may have run afoul of an unspecified Virginia wage law and the FLSA, but he did not appear sure that any statute had been violated. Johnson's advice that Eldor must comply with Virginia law" and to investigate whether Eldor "was violating the FLSA was inadequate" to be a protected activity pursuant to the FLSA. (JA 1082-1083). The trial court also cited the "manager's rule" articulating, "that in order to adequately put an employer on notice, a manager must step outside his or her role representing the company to alert an employer that they are engaging in an FLSA protected activity." *See McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996). (JA 1096) "Johnson never stepped outside of his role to assert an FLSA violation," opined the trial court before dismissing the matter. (JA 1098).

## B. Johnson Raised FLSA Protected Complaints Immediately Prior to Termination

Mr. Johnson's primary concern at Eldor regarding his subordinate employees was the illegality of paying employees zero compensation after working more than forty hours a week. As he testified, "***I'd brought up to Fabio [Piscone, Plant Manager] that I'd found the legality in Virginia being you can't work a non-engineer over forty hours without some kind of compensation***." (JA 411).

Mr. Johnson recalled that November of 2018, one month prior to his termination, "would have been the timeframe" that he "approached" Mr. Piscone and Ms. Farmer "about the compensation . . . to work on getting us out of the overtime issue." (JA 450). Mr. Johnson had numerous meetings on this subject with plant management including Mr. Piscone, Ms. Farmer, and Chief Operating Officer Giovanni Scafidi.

## C. A Retaliatory Performance Improvement Plan

Just days before his termination, Mr. Johnson was provided a performance improvement plan by Mr. Piscone. (JA 428-429). Mr. Johnson was stunned. "Nobody had ever brought up poor work performance with me prior to any concerns that I had . . . against overtime suits." (JA 498). Mr. Johnson had never received a single work performance evaluation while employed by Eldor. (JA 498). Prior to being terminated, Mr. Johnson had

4

also never received any workplace discipline of any kind.  Johnson Dep. (JA

564).  Regarding the plan specifically, Mr. Johnson testified that he signed it

out of fear for his job and that it suspiciously followed protected activities

regarding overtime compensation just a month prior:

> Q: Sitting here today, do you acknowledge these performance issues and agree with this performance improvement plan?
>
> A: I do not.
>
> Q: Why did you sign then?
>
> A: I actually asked him if I had to.  He said I did have to sign it.  I mean, I was in fear for my job.

(JA 564).

> Q: So, this document, it's dated December 10th and you signed it December 12th.  You may not remember the exact date, but . . . from this date, December 10th, how much earlier did you have a meeting with Mr. Scafidi and Mr. Piscone in which you complained to them regarding the issues of legality of overtime payments and the need to observe Virginia law?
>
> A: It was at least a month.

(JA 568).

> Q: A month prior to that.  Now when Mr. Piscone mentioned to you - - I think if I'm following your testimony from earlier correctly, that the Turkish employees wouldn't complain as much as American employees.  Do you recall that?
>
> A: Yes.

Q: And he said that?

A: Correct.

Q: All right. What did you take him to mean about complaining, complaining about what, for instance?

A: He mentioned overtime specifically . . .

(JA 567).

### D. Protected Activities Corroborated by Co-Worker

In September of 2018, Eldor hired Robert Helms as a Production Line Manager, a peer of Mr. Johnson who considered himself to be a "side-by-side co-worker" to Mr. Johnson. (JA 949). Mr. Helms worked beyond Mr. Johnson's tenure before leaving Eldor in November of 2020. (JA 950). Like many other employees and former employees, Mr. Helms testified that getting the facility up and running required long hours. When the "plant was starting up . . . it was hectic and very busy," including employees wearing "different hats at times . . . to get everything moving." (JA 951). The hours "could be very long at times." (JA 952).

Mr. Helms recalled in his deposition that Mr. Johnson had advocated for overtime rights:

Q: Did you ever have any conversations with Mr. Johnson while you were both working there about whether some of these workers on these shifts were being paid proper overtime?

6

A: Yes, we did.

Q: Did Mr. Johnson - - it's characterized in his lawsuit that he brought these concerns to management at Eldor.  Did you know him to do that?

A: Yes.

(JA 954).

Q: Is it your understanding that Mr. Johnson had conversations about overtime with either Bridgette Farmer or Fabio Piscone?

A: Yes.  I don't want to say that I was present for those conversations, but I have had conversations with Matt as we worked together about things we brought to management.

(JA 955).

### E. Plaintiff's December 11, 2018 Email and "Overtime"

On December 11, 2018 - - a mere two days before his wrongful termination - - Mr. Johnson sent an email to Chief Operating Officer Scafidi. In the email, Mr. Johnson wrote, "You most likely already know however my team is still running the line.  Only two line technicians have been hired for second shift since you were last here.  This will leave my winding engineer as a tech for at least two more months.  We are asking my group to alternate between first and second shift. ***We are asking them to work many hrs.***

***_of overtime without a hint of compensation._*** ” (emphasis added). (JA
994).

Mr. Scafidi knew in precisely what context this issue was raised by Mr.
Johnson, as it was not the first occurrence. "It wasn't the first time that we
met with Scafidi, but by the second time that we met with Scafidi, ***_I did_***
***_mention that in our meeting that we needed to comply with_***
***_Virginia law with the overtime_***." (JA 433). "Scafidi and Fabio were in
the same meeting room when Scafidi said, 'absolutely, if it's within the
Virginia law, then we need to do something. We need to comply with
whatever that is.'" (JA 434). Mr. Johnson was terminated by Mr. Piscone two
days after this email. Further, Mr. Scafidi testified as follows:

> Q: This email was sent to you from Mr. Johnson on
> December 11th, is that right? It says . . . "we are
> asking them to work many hours of overtime without
> a hint of compensation." Do you see that? Okay. So,
> isn't that Mr. Johnson reporting to you that there are
> workers who maybe should be paid overtime but
> weren't being paid overtime?"
>
> A: In this mail, yes . . .

(JA 1010).

8

**F. Mr. Johnson's Email - - A Protected Act - - Angers Mr. Piscone**

Mr. Johnson described his termination meeting: "I get in his office and they showed me the email that I had sent to Scafidi, and said we can't work in this condition, and Bridgett said that I was terminated." (JA 459). The email presented to Mr. Johnson in the meeting was his December 11, 2018 email accusing Eldor of not paying its workers overtime compensation. (JA 994).

During Mr. Johnson's tenure at Eldor, the highest-ranking member of management in the United States was Fabio Piscone, the Plant Manager. (JA 1026). The decision to terminate Mr. Johnson was made by Mr. Piscone and Ms. Farmer, both individuals to whom Mr. Johnson had complained of overtime matters. (JA 1029). Interestingly, Mr. Piscone testified that he expressed negativity toward an employee such as Mr. Johnson circumventing the chain of command to address issues with an employee higher than Mr. Piscone:

> Q: Is it a problem if an employee voices a concern outside of the chain of command? For instance, if an employee was to go around someone above him and go to someone higher up on the chain of command, is that looked at unfavorably by Eldor?
>
> A: It's something that, generally, it's not common at all. And nobody want to do this because it's also a little unfair; it's unfair.

9

(JA 1031).  However, this creates quite a contradiction with the testimony of

Mr. Scafidi:

> Q: Mr. Piscone was above Mr. Johnson, correct?
>
> A: Yes.
>
> Q: . . . [I]s it fair to say that Mr. Johnson was going over the chain of command to get to you?
>
> A: In our company, it's possible, because my door is always open.

(JA 1012).

Mr. Johnson described his termination meeting: "I get in his office and

they showed me the email that I had sent to Scafidi, and said we can't work

in this condition, and Bridgett said that I was terminated." (JA 459).

## IV.    SUMMARY OF ARGUMENT

This Circuit disfavors the "problematic" "manager's rule". Regardless,

Mr. Johnson engaged in protected activities and stepped outside of his role

as a manager to do so, even in the face of retaliation.  No basis existed for

granting summary judgment as Mr. Johnson had produced sufficient

evidence in the light most favorable to him to proceed to a jury trial for his

claim of FLSA retaliation.

## V. STANDARD OF REVIEW

Appellate courts review a district court's summary judgment ruling under a *de novo* standard of review. *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995). Under the Federal Rules of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, [and] depositions . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Parkman v. Univ. of S.C.*, 44 F. App'x 606, 615 (4th Cir. 2002). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The essence of the inquiry made by the court is thus "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252.

On summary judgment, a court may not resolve disputed facts, weigh evidence, or determine credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995). If a court concludes that if a reasonable jury *believed* evidence of the non-moving party, and *disbelieved* the moving party's evidence, the jury could find for the non-moving party at trial, it should

11

overrule the Motion for Summary Judgment. *Marlow v. Chesterfield Cty. Sch. Bd.*, 749 F. Supp. 2d 417, 437-38 (E.D. Va. 2010).

## VI.    ARGUMENT

The Fair Labor Standards Act ("FLSA") creates a cause of action for retaliation for employees whose employment is terminated in response to their complaints about a failure to provide overtime compensation or comply with the FLSA.  The potential class is broad as the Act provides it applies to "any person" and protects "any employee" whether exempt or non-exempt. Specifically, it is "unlawful for any person . . . to discharge . . . any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to th[e] [FLSA] . . . ." 29 U.S.C. § 215(a)(3).

To state a claim for FLSA retaliation, a plaintiff must allege that "(1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008).  Mr. Johnson provided sufficient evidence to the trial court of all three elements.

This antiretaliation provision "effectuates enforcement of the Act's substantive provisions by removing 'fear of economic retaliation' so that employees need not 'quietly . . . accept substandard conditions.'" *Id.* (*quoting Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S. Ct. 332, 4 L. Ed. 2d 323 (1960)). Courts "must interpret the retaliation provision 'bearing in mind the Supreme Court's admonition that the FLSA "must not be interpreted or applied in a narrow, grudging manner.'" *Id.* (*quoting Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 364 (4th Cir. 2000) (*quoting Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S. Ct. 698, 88 L. Ed. 949 (1944))).

### A. FLSA Protects "Any Employee" – Including Mr. Johnson

The FLSA protects "any employee" from retaliation by "any person," but only if "such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to th[e] [FLSA]. . . ." 29 U.S.C. § 215(a)(3). Significantly, not "every instance of an employee 'letting off steam' to his employer constitutes protected activity"; rather, "'the statute requires fair notice to employers." *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 439 (4th Cir. 2012) (discussing "'degree of formality' . . . required for an employee complaint to constitute protected activity") (*quoting Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14, 131 S. Ct. 1325, 179

L. Ed. 2d 379 (2011)). The Court considers whether an employee's "complaint to her [or his] employer was 'sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Id.* (*quoting Kasten*, 563 U.S. at 14).

Consider *Randolph v. ADT Sec. Servs.*, Inc., 701 F. Supp. 2d 740 (D. Md. 2010). There, the plaintiffs complained that their employer was refusing to pay them compensation that they believed was owed to them including overtime compensation.  They believed they were due overtime because they worked more than forty hours per week. *Randolph*, 701 F. Supp. 2d at 742. ADT suspended and then terminated the plaintiffs which became the basis for a suit alleging retaliation in violation of § 215(a)(3). *Id.* at 743. The defendant moved to dismiss on the basis that "Plaintiffs were excluded from coverage under § 215(a)(3) because [they were] commission-based employees and so were not eligible to file a 'complaint.'" *Id.* at 744. The court disagreed, concluding that the plaintiffs "properly alleged that they engaged in an activity protected" despite their status as exempt reasoning that they made the "complaint because they had the reasonable belief that they had been misclassified as commission-based employees and that they had been

14

inadequately compensated for overtime work that they performed for defendant." *Id.* at 746 (emphases added).

### B. Mr. Johnson Made Written and Oral Complaints - - Oral Complaints Similarly Protected

In 2012, the Fourth Circuit Court of Appeals resolved the sole issue of whether internal complaints regarding FLSA rights qualified as protected activities under the FLSA. In *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 439 (4th Cir. 2012), the Fourth Circuit followed the U.S. Supreme Court's ruling in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, (2011), that found that internal oral complaints qualified as protected activities under the FLSA.

The key language from the FLSA regarded the meaning of the phrase "filed any complaint". As analyzed in *Minor*, the Fourth Circuit adopted the U.S. Supreme Court's interpretation of "filed any complaint" as decided in *Kasten*. *Kasten* focused the majority of its plain-language analysis on the meaning of the word "filed" to decide whether an oral complaint could trigger protection. The *Minor* Court went further than *Kasten* and also construed the term "any complaint". In an echo of the ruling in *Kasten*, the *Minor* Court opined, "a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their

protection." *Id.* at 1335.  With other circuits such as the 6th, the 8th, the 9th, the 10th, and the 11th all concluding that oral intracompany complaints were protected activities under the law, the *Minor* Court ultimately sided with the majority of circuits in holding that "the remedial purpose of the FLSA requires intracompany complaints to be considered protected activity within the meaning of its antiretaliation provision." *Id.* at 438.

As provided in *Minor*, "the proper standard for the district court to apply is the aforementioned test articulated in *Kasten*: whether Minor's complaint to her employer was 'sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Minor* at 439.  Mr. Johnson's complaints squarely fall within this category.  He stated to Mr. Scafidi, Mr. Piscone, and Ms. Farmer one month prior to his termination that he had concerns regarding "legality in Virginia being you can't work a non-engineer over forty hours without some kind of compensation." (JA 411).  Further, he highlighted "overtime" in an email to Mr. Scafidi two days before his termination.  Any reasonable juror could find that Mr. Johnson's use of the term "overtime" as it related to his subordinate workers was a repeat of the exact same issue that he had

16

advanced earlier, the legality of not paying workers beyond forty hours per week, which, other than minimum wage, is the entire thrust of the FLSA.

### C. One Month Prior and Two Days Prior: Quite the Temporal Proximity

Given the timing of these complaints, temporal proximity heavily favors Mr. Johnson. The Fourth Circuit has found on numerous occasions that mere temporal proximity between the protected activity and the adverse employment action established the causation element. *See Williams*, 871 F.2d 452 (three months sufficient to create temporal proximity); *King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003) (two-and-one-half months sufficient to create temporal proximity); *Price v. Thompson,* 380 F.3d 209 (4th Cir. 2004) (nine to ten months sufficient to create temporal proximity); *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017) (three months sufficient to create temporal proximity). Indeed, the Supreme Court implicitly endorsed the temporal proximity basis adopted by the Courts of Appeals in *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268 (2001) (temporal proximity must be "very close"). While one Fourth Circuit case has not created a bright-line cut off in temporal proximity, case precedent suggests three months is sufficiently close to establish temporal proximity. *Cf. Breeden*, 532 U.S. at 273.

### D. *McKenzie v. Renberg* and the "Manager's Rule"

The trial court held that the manager's rule prevented advancement of this case because "Mr. Johnson never stepped outside of his role as a manager to assert an FLSA violation." (JA 1098). The trial court erred as *McKenzie* is highly distinguishable from the instant matter. In *McKenzie*, a personnel manager distributed FLSA materials gathered from a work conference to management and voiced her thoughts. *Id.,* 94 F.3d 1478, 1481 (10th Cir. 1996). These acts alone were insufficient.

The FLSA's anti-retaliation provision prohibits discrimination against an employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). This Court has long held that intracompany complaints of the like and type by Mr. Johnson qualify as having "filed a complaint" for purposes of the anti-retaliation provision of the FLSA. *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 430 (4th Cir. 2012) ("we find that intracompany complaints may constitute protected activity within the meaning of § 215(a)(3)").

The record of this case demonstrates that Mr. Johnson consistently angered his employer with his repeated complaints that Eldor follow the law,

18

even in the face of discipline and termination. After receiving a retaliatory

performance improvement plan, Mr. Johnson persisted with his protected

acts despite knowledge that Eldor would likely continue to retaliate. These

factors are absent from *McKenzie*. Further, this Circuit has not

demonstrated a history of adopting the "manager's rule" and has termed the

rule "problematic". *See DeMasters v. Carilion Clinic*, 796 F.3d 409 (4th Cir.

2015) (holding that this Circuit does not adopt the "manager's rule" for Title

VII matters.).

In rejecting the "manager's rule" in *DeMasters*, this Court considered

the policy behind the rule:

> Supreme Court precedent also militates against
> restricting the scope of Title VII's anti-retaliation
> provision, which has been held to "provide broad
> protection from retaliation," *Burlington N.*, 548 U.S.
> at 67, and to cover a wide range of conduct through
> which an employee communicates to an employer
> the employee's "belief that the employer has engaged
> in . . . a form of employment discrimination,"
> *Crawford*, 555 U.S. at 276; see also *id.* (observing
> that an employee's communication to her employer
> of a belief the employer has discriminated "virtually
> always constitutes the employee's opposition to the
> activity").
>
> While the Court indicated in Crawford that there may
> be "eccentric" exceptions to the sweeping protections
> of the Opposition Clause, such as "an employee's
> description of a supervisor's racist joke as hilarious,"
> neither in *Crawford* nor in subsequent cases has the

Court endorsed a categorical exception based on an employee's workplace duties. *Id.*

The "manager rule" is also problematic when viewed in conjunction with two other doctrines that restrict an employer's Title VII liability. First, under the balancing test adopted by this Circuit in *Armstrong v. Index Journal Co.*, 647 F.2d 441 (4th Cir. 1981), an employer may not be liable under Title VII if an employee's conduct at work is sufficiently "insubordinate, disruptive, or nonproductive." *Id.* at 448. **Applying this doctrine in tandem with the "manager rule" thus would create a dilemma for employees who would have to step outside the scope of employment for their activity to be protected under Title VII's anti-retaliation provision, but would risk losing that protection if the deviation from their job responsibilities could be deemed sufficiently insubordinate or disruptive. *See* Deborah L. Brake, *Retaliation in the EEO Office*, 50 Tulsa L. Rev. 1, 31 (2014). We see no need to make plaintiffs walk a judicial tightrope when the statutory scheme created by Congress offers a clear path to relief.**

*DeMasters v. Carilion Clinic*, 796 F.3d 409, 422-23 (4th Cir. 2015) (emphasis added).  The same reasoning holds in the instant matter.

The "manager's rule" contemplates an impossibly fine line for a plaintiff to traverse. The plaintiff must "oppose" to be protected.  But "oppose" too much, or a subjectively incorrect fashion, and the plaintiff is deemed insubordinate.  The same reasoning for the Court's rejection of the

20

"manager's rule" in *DeMasters* applies here.   Mr. Johnson engaged in protected activities and no good basis exists for a "manager's rule" to obstruct the anti-retaliation provision of the FLSA.

Further, as acknowledged in *DeMasters*, Eldor may maintain other defenses to such claims of retaliation without resorting to a disfavored rule. "[T]he Supreme Court has provided employers with an affirmative defense under certain circumstances when an employee fails to report and to take advantage of an employer's internal investigation processes. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). *DeMasters* at 423 (4th Cir. 2015)

## VII.   CONCLUSION

Mr. Johnson engaged in numerous protected activities throughout his tenure at Eldor. His two most significant occurred in close temporal proximity to his termination. One month prior to his termination, he complained of the legality of not paying workers beyond forty hours of work per week to management.  Two days before his termination, he referenced the same "overtime" issues to Eldor's Chief Operating Officer. The trial court simply cut this matter too thin in determining there existed no genuine issue

of material fact.  This matter must be reversed and remanded for further

proceedings.

## VIII.    REQUEST FOR ORAL ARGUMENT

On behalf of the Appellant, we hereby request oral argument.


Respectfully submitted,

/s/ Thomas E. Strelka
Thomas E. Strelka, Esq. (VSB# 75488)
STRELKA EMPLOYMENT LAW
4227 Colonial Ave.
Roanoke, VA 24018
Tel: 540-283-0802
thomas@strelkalaw.com